FILED

2004 FEB 12  P 12: 12

US

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM J. MAZE, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03CV166 (SRU) |
| | : | |
| v. | : | |
| | : | |
| FINANCIAL FREEDOM SENIOR | : | |
| FUNDING CORPORATION | : | |
| | : | |
| Defendants. | : | FEBRUARY _10_, 2004 |

### DEFENDANT'S MEMORANDUM OF LAW
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Financial Freedom Senior Funding Corporation ("Financial Freedom"), by

and through its undersigned counsel, submits this memorandum of law in support of its motion

for summary judgment on the Amended Complaint.

### Preliminary Statement

Financial Freedom sells reverse mortgage products providing tax free cash advances to

seniors against the equity in their homes.  In this action, Plaintiff, William Maze, seeks recovery

of commissions on reverse mortgage loans funded by Financial Freedom in Connecticut for an

undefined period of time following the end of an alleged affiliation he had with Unity Mortgage

Corporation.  The reverse mortgage assets of Unity were purchased by Financial Freedom in

November 2000.  Plaintiff was never employed by Financial Freedom and according to his own

deposition testimony secured not a single loan application during his claimed brief tenure with Unity. Nonetheless, without any evidence connecting him to loans funded by Financial Freedom in Connecticut, Plaintiff claims close to $1 million dollars in damages (see Plaintiff's Supplemental Initial Disclosure and Damages Analysis, attached as Exhibit 1) by virtue of a single mass mailing he sent to senior citizens in Greenwich and Stamford, Connecticut, advertising the availability of reverse mortgage loans through Unity. Plaintiff's claims against Financial Freedom are based singularly on his own speculation that his mailing must have been the procuring cause of all the loans funded by Financial Freedom in those towns after his mailing went out. As set forth below, summary judgment should be granted.

### Allegations of the Complaint

Plaintiff's claims against Financial Freedom are framed in Eleven Counts. Plaintiff alleges that he was made an offer to work as a Reverse Mortgage Specialist in Connecticut through Unity Mortgage Corporation (Second Amended Complaint, ¶ 10), that the reverse mortgage assets of Unity were later acquired by Financial Freedom (*id.*, ¶ 12), that Plaintiff was entitled to a commission "on each mortgage loan closed arising out of leads generated" by him (*id.*, ¶ 16) and that he "expended great efforts and expense to generate leads for reverse mortgage loans for Unity Mortgage Corporation and then for Financial Freedom" (*id.*, ¶ 18), after which he claims he was "suddenly and unreasonably terminated" (*id.*, ¶ 19). Plaintiff further alleges that he was denied the opportunity to proceed with "a specific Financial Freedom reverse mortgage loan application that was about to close as a result of a lead generated by the plaintiff" (*id.*, ¶¶

21-22), that he was deprived of commissions and reimbursement of expenses incurred in his mass mailing of brochures (*id.*, ¶ 23) and that "Financial Freedom proceeded to close numerous reverse mortgage loans in Connecticut arising out of leads generated by plaintiff" (*id.*, ¶ 24).

Based on these allegations, Plaintiff claims compensation due under section 31-72 of the Connecticut General Statutes (First Count); wrongful discharge in violation of the public policy expressed in section 31-72 of the Connecticut General Statutes (Second Count); breach of an agreement to pay commissions (Third Count); breach of an implied covenant of good faith and fair dealing for failing to perform "good-faith agreements made and acknowledged in the course of its business" (Fourth Count); promissory estoppel for failing "to pay the plaintiff the compensation due" (Fifth Count); unjust enrichment for "reaping the benefit of plaintiff's marketing efforts and costs" (Sixth Count); fraudulent misrepresentation for "intentionally and falsely represent[ing] to plaintiff that plaintiff would be paid compensation by way of commission on origination fees on Financial Freedom reverse mortgage loans closed in Connecticut through plaintiff's efforts" (Seventh Count); negligent misrepresentation "by supplying false information and representations to plaintiff" (Eighth Count); negligent infliction of emotional distress for "its conduct toward the plaintiff as alleged" (Ninth Count); in the alternative, a violation of the Connecticut Unfair Trade Practices Act for utilizing "the device of the acquisition of reverse mortgage loan assets of Unity Mortgage Corporation to cause a severance of the agreement with plaintiff and then used the fruits of plaintiff's labors so as to keep all the profits for its own enrichment" (Tenth Count); and tortious conspiracy with Unity

Mortgage to "deceive plaintiff for the enrichment of one or both of said corporations at plaintiff's expense" (Eleventh Count).

## Facts

### Plaintiff's Alleged Employment

By letter dated October 12, 2000 (attached as Exhibit 2), Plaintiff was apparently extended an offer of employment by Unity Mortgage Corporation to act as a Reverse Mortgage Specialist paid on a commission basis as follows:

> 35% of the origination fee for each closed loan when Unity Mortgage Corporation in Albany, NY supplied you with the lead. The Commission structure will be 50% of the origination fee for any loan that has closed whereupon you have generated the lead.

The letter does not offer any expense reimbursement; neither does it provide for any payment of commissions after termination of employment. (*Id.*)

Plaintiff claims he had found information about Unity Mortgage Corporation on the Internet, called for information and was referred to a Regional Manager, Jeanine Ehrlich (Deposition Transcript of William Maze[1], pp. 30-33). Plaintiff met with Ms. Ehrlich in October of 2000, at which time, he claims Ms. Ehrlich gave him employment application forms for Unity Mortgage Corporation and Financial Freedom (Pl. dep., pp. 56-58) and told him to send them to her when she told him to (Pl. dep. pp. 66-67). He also claims she discussed with him the fact

---

[1]     Hereinafter "Pl. dep.", cited pages are attached as Exhibit 3.

that Unity was in the process of being bought by Financial Freedom and that she would still be running the office and responsible for hiring when it did. (Pl. dep., p. 47).

Plaintiff returned the completed Financial Freedom employment application which he had signed on October 17, 2000 (attached as Exhibit 4) to Ms. Ehrlich on November 24, 2000 (Pl. dep., pp. 64-65) stating in his cover letter: "Please find enclosed my completed Employment Application which I have been holding as you suggested until the takeover had been finalized – which, I understand, is now the case."

The Financial Freedom employment application includes an acknowledgement providing:

> that I understand that nothing contained in this application or in the interview process is intended to create a contract between the Company and myself for either employment or for the providing of any benefits. I agree that, if hired, my employment will be at-will and the terms of employment may be changed with or without cause, with or without notice, including but not limited to termination, demotion, promotion, transfer, compensation, benefits, duties and location of work, at any time, for any reason, at the option of myself or the Company. This constitutes my entire agreement with the Company with regard to the length of my employment. I hereby acknowledge that I have read the above statements and understand them.

On December 1 and 2, 2000, Plaintiff signed employment forms for Unity Mortgage Corporation (attached as Exhibit 5).

There is a "Receipt of Employee Handbook" form signed by Plaintiff stating that:

> I have entered into my employment relationship with Unity Mortgage voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or Unity Mortgage can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law.
>
> Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to Unity Mortgage's policy of employment-at-will.    All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies.    Only the chief executive officer of Unity Mortgage Corp. has the ability to adopt any revisions to the polices in this handbook.

There is a signed Unity Mortgage "Applicant Statement" form signed by Plaintiff providing that:

> If I am hired, I understand that I am free to resign at any time, with or without cause and without prior notice, and the employer reserves the same right to terminate my employment at any time, with or without cause and without prior notice, except as may be required by law.    This application does not constitute an agreement or contract for employment for any specified period or definite duration. I understand that no supervisor or representative of the employer is authorized to make any assurances to the contrary and that no implied oral or written agreements contrary to the foregoing express language are valid unless they are in writing and signed by the employer's president.

There is a certification to the application form signed by Plaintiff stating that:

> I understand I may terminate my employment at any time and for any reason without prior notice.  I agree that if I am hired, I will be employed at the will of Unity Mortgage

> Corp. and my employment can be terminated at any time, with or without notice. \*\*\* I understand the company reserves the right to add to, change and/or delete their policies, procedures, work rules and benefits at any time and that no one in the Company has the authority to enter into any agreement, for any particular period of time, or contrary to the above terms, unless that agreement is set forth in writing and signed by the President or Senior Vice President of Unity Mortgage Corp.

Finally, there is a "Conditions of Employment" form from the Unity Mortgage Corp.

Policy and Procedures Manual signed by Plaintiff stating that:

> I am aware that my employment is "At Will" meaning I can quit at any time and likewise, may be terminated at any time. In this regard, I understand that the current policies and procedures may be changed from time to time and that no current policies and procedures constitute a contract between myself and Unity Mortgage Corp.

When asked why he had completed and signed these forms eight days after returning the

Financial Freedom application to Ms. Ehrlich, Plaintiff testified:

> The reason is my understanding was Financial Freedom were buying over the Unity Mortgage company. Anything that was filled in on the forms for Unity Mortgage was on the instructions of Jeanine Ehrlich as a stop gap measure. Because I believe she told me that Financial Freedom was not yet fully licensed to do business in Connecticut and that they had to obtain these licenses which was going to take some time. And in the meantime to fill in these forms for Unity Mortgage as a formality. . . . (Pl. dep., p. 70).

Plaintiff claims Ms. Ehrlich made representations to him that led him to believe he was or

would be employed by Financial Freedom but, aside from her alleged statements in the October

2000 interview that she would be running the office and responsible for hiring after the asset purchase, *see, supra*, p. 5, Plaintiff could not substantiate that any representations were made by Ms. Ehrlich to him.  He testified:

> A.    There was no doubt in my mind at that time that the whole thing was going to be Financial Freedom and that there was -- and according to Ms. Ehrlich, there weren't going to be any ongoing -- any problems in the takeover and ongoing relationships.

> Q.    That was based upon the discussions that you had with Ms. Ehrlich that you previously testified about?

> A.    That I previously had and subsequently on the telephone.

> Q.    Okay.  Why don't you tell me about the subsequent conversations on the telephone with Ms. Ehrlich.  When did those take place?

> A.    No, I can't remember exactly when they took place.  They were telephone conversations relating to business.   And my whole feeling, understanding was that there was -- that we were proceeding according to plan.

> Q.    What did Ms. Ehrlich say exactly that led you to believe that?

> A.    I can't say it's exactly.  She said -- gave me to understand by certain words and expressions and so on that it was an ongoing relationship.

> Q.    Well what certain words and expressions did she use?

> A.    I can't remember that.

> Q.    Can you give me the gist of it?

> A.    No, I can't.

(Pl. dep., pp. 76-77).

When asked if he had ever received an offer of employment with the name Financial Freedom on it, Plaintiff identified the Financial Freedom employment application he had filled out which, as noted above, specifically provides that it does not create an offer of employment. (See Exhibit 4).

**The Asset Purchase**

Financial Freedom purchased the reverse mortgage assets of Unity Mortgage on November 23, 2000 (affidavit of Junie Villongco, Financial Freedom's Vice-President of Administration, ¶ 3) and Unity Mortgage Corporation continues to exist as an independent corporation with corporate offices located at Unity Mortgage Corp., 7840 Roswell Road, Atlanta, GA 30350. (*Id.*). Financial Freedom's headquarters are located at 7595 Irvine Center Drive, Suite 250, Irvine, California 92618. The two companies are not commonly owned, controlled or managed. (*Id.*). In connection with the purchase of Unity's reverse mortgage assets, Financial Freedom agreed to hire certain specified Unity employees set forth on a list of Unity employees prepared by Unity. Plaintiff did not appear on that list. (Villongco aff., ¶ 4 and Exhibit A thereto). Those Unity employees hired by Financial Freedom were sent letters offering them employment with Financial Freedom and setting forth the terms and conditions thereof. (Villongco aff., ¶ 5 and Exhibit B thereto). Loan Originators hired by Financial Freedom from Unity were sent letters providing in part:

Please accept this letter as our formal offer of employment with Financial Freedom Senior Funding Corporation ("Financial Freedom" or the "Firm"), commencing as of November 23, 2000. Your employment by the Firm on and after this start date will be governed by the terms of this letter....

You will receive compensation in accordance with the commission compensation schedule attached as Exhibit A . . .

\* \* \*

Please understand that the terms and conditions of your employment by Financial Freedom will be governed by standard Firm policies. Among other things, this means that this offer of employment is contingent on the successful completion of a background investigation, as well as on your satisfactorily meeting all pre-employment requirements, including passing a pre-employment drug screen, completion and return of the employment package and producing documentation to verify your identity and eligibility to work in the United States.

During the course of your employment, you are free to leave at any time for any reason, and the Firm reserves a similar right. Thus, both you and the Firm will have the right to terminate your employment at any time, with or without advance notice and with or without cause. This is called "employment at will," and no one other than an officer of the Firm has the authority to alter this arrangement, to enter into an agreement for employment for a specified period of time, or to make any agreement contrary to this policy and any such alteration or agreement must be in writing, signed by both the officer and you.

We look forward to having you join our Firm. Please indicate your acceptance of this offer of employment by signing below. Retain one copy of this letter for your records and return a countersigned copy to Lesley Hanley, Human Resources Administrator, no later than November 28, 2000.

Exhibit B to Villongco aff.). Plaintiff was not sent this letter. (Villongco aff., ¶ 5; Pl. dep., p.

70). Unity retained all and Financial Freedom assumed no obligations with respect to Unity

employees, like Plaintiff, who were not offered employment with Financial Freedom (Villongco

aff., ¶ 6 and Exhibit A thereto).

The Commission Compensation Schedule for Unity employees hired by Financial Freedom provides that commissions are payable for "Direct Origination Loans" and "Indirect Origination Loans" defined as follows:

> "Direct Origination Loans" shall mean those funded Loans that the Firm has determined were originated solely through your own efforts.  The identification of loans as Direct Origination Loans or Indirect Origination Loans shall be made by Firm management in its sole discretion.

> "Indirect Origination Loans" shall mean those funded Loans that the Firm has determined you had substantial origination responsibilities, but not solely through your own efforts. The identification of loans as Direct Origination Loans or Indirect Origination Loans shall be made by Firm management in its sole discretion.  (Exhibit B to Villongco aff., Schedule A).

With respect to payment of commissions following termination of employment, the Commission Compensation schedule provides:

> **e)  Commission Payments on Termination of Employment.**
> Commission will be paid following any termination of employment with respect to Eligible Loans that were funded, and (if applicable) Annuities that are sold, before such termination of employment.  In addition, commissions will also be paid following employment termination with respect to Eligible Loans that have reached at least the underwriting stage at the time of employment termination and that are funded within 60 days after employment termination. No commission payments will be made with respect to Annuities sold after employment termination.  (Exhibit B to Villongco aff., Schedule A).

From November 23, 2000 through the end of January 2001, Unity Mortgage continued its reverse mortgage business in Connecticut because Financial Freedom had not yet obtained its licensure in Connecticut. (Villongco aff., ¶ 7).  By agreement, those employees of Unity who had been hired by Financial Freedom, including Jeanine Ehrlich, continued to act on behalf of

Unity during this time period. (*Id.* and Exhibit A thereto)  During the transition, use of Financial Freedom computer programs and reporting systems which Unity employees and contractors may have had access to, were phased in and used by Unity. (*Id.* and Exhibit A thereto).

**Claimed Factual Basis for Plaintiff's Claims Against Financial Freedom**

In December of 2000, Plaintiff claims he sent out a mailing advertising the availability of reverse mortgage loans through Unity Mortgage (copy attached as Exhibit 6) to senior residents of Stamford and Greenwich whose names and addresses he had obtained by Freedom of Information requests to those two towns. (Pl. dep., p. 78-82).  The lists contain approximately 1300 names and addresses. (Affidavit of Clara Koczi Paralegal, ¶ 4).  Plaintiff's business card also identified Unity Mortgage as his employer (attached as Exhibit 7).

In the years 2001 and 2002, Financial Freedom funded approximately 495 reverse mortgage loans in the State of Connecticut (Villongco aff., ¶ 8).  By checking land records in the Towns of Stamford and Greenwich, Plaintiff uncovered the names of nine individuals who had appeared on his lists and who had obtained reverse mortgage loans funded by Financial Freedom. (Pl. dep., pp. 161-162).  In discovery, Plaintiff was provided a listing of all 495 loans from 2001 and 2002 and found two additional individuals he claims to have sent his mailing to in December 2000 (see Plaintiff's Supplemental Initial Disclosure, Exhibit 1 hereto).  Plaintiff claims he is entitled to commissions on these loans simply by virtue of the fact that he asserts the individuals were sent his mass mailing in December 2000 (Pl. dep., p. 160).  Plaintiff's testimony acknowledges that the basis for his claims is purely conjecture:

> Q.   And how do you know that any of these loans resulted from the mailing that you sent out?
>
> A.   Well, it would seem too much of a coincidence if they didn't.
>
> Q.   And why do you say that?
>
> A.   Well, all of these names came from – were included in the mailings that I sent out.

(Pl. dep., p. 161).

However, Plaintiff also acknowledged that there were other ways of finding reverse mortgage lenders in Connecticut aside from his mass mailer:

> Q.   But people might have been able to look them [Unity Mortgage] up on the Internet the same way you did, correct?
>
> A.   They could, yes.  Probably they didn't.

(Pl. dep., p. 56).

Plaintiff claims his employment was terminated by Jeanine Ehrlich towards the end of January 2001 as follows:

> Q.   But I take it that you did stop working for the company at some time?
>
> A.   Yes.  I was forced to stop by Jeanine Ehrlich.
>
> Q.   And when did that happen?
>
> A.   Best of my recollection, it would have happened towards the end of January.
>
> Q.   Towards the end of January, 2001?
>
> A.   Correct.

Q.    And how did that come about?

A.    From a telephone call which I received from Ms. Ehrlich.

Q.    And what was said in that telephone conversation?

A.    Basically -- Well, bottom line was -- that the company was terminating my employment.

Q.    And what did she say in that regard?

A.    I believe she gave me several reasons based on the -- based on the -- her excuse was the -- What's the word? The policy, that's what I'm looking for. The policies of the new company or Financial Freedom, which had, in fact, taken over the business of Unity Mortgage.

Q.    Was that all she said?

A.    Basically that's what she said. She made that the reason. I never did, in fact, receive any written confirmation of the termination, looking back on it now.

(Pl. dep., pp. 121-22)


## The Commissions Claimed

The eleven loans Plaintiff claims commissions on are as follows:

- Loretta Pipicelli dated 10/9/01
- Rafella Vizzari dated 11/7/01
- Adelaide Stowell dated 11/8/01
- Genevieve Walsh dated 10/25/02
- Svea Shnabel dated 10/29/02
- Claire Hirt dated 5/1/01
- Felicity Hoffecker dated 8/20/01
- Margaret Brondo dated 4/11/02
- Sophie Parker dated 6/7/02
- Lillian Hultgreen dated 12/14/01
- Dagny Halka dated 6/27/02

(Plaintiff's Supplemental Initial Disclosures, attached as Exhibit 1, pp. 2-3).

The earliest of the claimed loans (Hirt) is dated more than three months after Plaintiff's claimed termination date; some (Walsh and Schnabel) extend as far out as twenty-one months after.

Despite the allegation contained in paragraphs 21 and 22 of the Complaint, Plaintiff admits he did not secure applications from any of these individuals or any other potential customers (Pl. dep., pp. 43-44), which Plaintiff acknowledges is the event that commences the processing of any loan (Pl. dep., p. 38). The only one of these individuals Plaintiff claims to have had any contact with at all is Mrs. Hoffecker. Plaintiff claims he met with Mrs. Hoffecker and looked into an issue involving her home being on a private road (Pl. dep., pp. 108-109) and then:

> A.    I went back to – back to visit Mrs. Hoffecker and explained the situation. We were trying to get it resolved, trying to get her the reverse mortgage. As soon as something more definite happened, I would advise her or call her and make an appointment.
>
> Q.    And did something more definite ever happen?
>
> A.    Not while I was there. It looked like it happened at a later date, because the – Mrs. Hoffecker did receive, in fact, or – did, in fact, receive a reverse mortgage from Financial Freedom at a later date.
>
> Q.    And how do you know that?
>
> A.    From the records in the city of Stamford.

(Pl. dep., p. 110).

Plaintiff also claims to have met with several other individuals who called within a month after his mailing was sent out but none of these ever secured financing funded through Financial Freedom (Pl. dep., pp. 103-106; 110-113).

**Procurement Of The Eleven Claimed Loans**

Like any mortgage, reverse mortgage loans include origination fees which are a percentage of the loan amount (Villongco aff., ¶ 8). Financial Freedom funded loans are mainly secured by customers through independent licensed brokers who retain the origination fee for each closed loan they have originated and processed. (Villongco aff., ¶ 8). Financial Freedom loans can also be obtained directly through the Company's Loan Originators in which case Financial Freedom retains the entire origination fee and may pay a commission, which is a percentage of the origination fee amount, to employees it determines were responsible for originating and processing the loan. (Villongco aff., ¶ 8). Financial Freedom retains the discretion to decide what employees are entitled to commissions on what loans (Villongco aff., ¶ 8 and Exhibit B thereto, Schedule A).

For nine of the eleven loans cited by Plaintiff - - Pipicelli; Vizzari; Stowell; Walsh; Hirt; Hoffecker, Parker, Hultgreen and Halka -- the entire origination fees were paid to an independent, licensed mortgage broker in Connecticut, Amston Mortgage Co. (Affidavit of

Amston Mortgage President, Todd Walters[2], ¶ 2).  In each case, Mr. Walters secured a loan application for a reverse mortgage on the subject property.  After an initial inquiry was made directly to Amston Mr. Walters sent each property owner and/or advisor a packet of materials and then met one or more times with the property owner and/or the property owner's advisors (the age of those eligible for reverse mortgage loans often requires dealing through a person with power of attorney or other representative authority), counseling them as to the various options and issues related to reverse mortgages and working through any problems arising in the processing and closing of the loans. (Walters aff., ¶ 4).  Adelaide Stowell and Genevieve Walsh were referred to Mr. Walters by their attorneys.  (Walters aff., ¶ 4).  Mrs. Walsh had initially been referred and secured a loan through Amston in 1999; she came back to Amston for new financing in 2002.  (Walters aff., ¶ 4).  Sophie Parker was also a repeat customer of Amston, first securing financing through them in 1997 and then refinancing in 2002; the same is true of Mrs. Hultgreen.  (Walters aff., ¶ 4).  Mr. Walters had numerous meetings with Felicity Hoffecker and was aware that she was meeting with several other lenders as well.  (Walters aff., ¶ 4).  Mr. Walters looked into an issue involving her house being on a private road and knew that she had initially decided to obtain funding through Amerifirst, another mortgage company, until he was able to offer her an FNMA product for which the private road was not a problem.  (Walters aff., ¶ 4).

---

[2]        Hereinafter cited as "Walters Aff."

- 17 -

All the other referenced property owners were similarly referred to Amston and Mr. Walters through other sources that Amston has developed over the eight years it has been in business in Connecticut. (Walters aff., ¶ 5). These sources include but are not limited to Amston's own website (in existence since 1996) and numerous listings of licensed reverse mortgage lenders appearing on the Internet (see, e.g., National Reverse Mortgage Lenders Association listing, attached as Exhibit 8 hereto) and supplied to seniors by various State and Town housing and elderly service offices throughout Connecticut. (*Id.*) None of the referenced clients was referred to Amston by anyone at Unity Mortgage or Financial Freedom (direct sales employees of which are Amston's competitors) and no payment was made by Amston to Unity Mortgage, Financial Freedom or any employee of either company in connection with those loans. (*Id.*). None of the information contained in the mailing sent by Mr. Maze referred to Amston Mortgage or any means of contacting Amston or Mr. Walters. (See Exhibit 5 hereto).

For the other two loans claimed by Plaintiff, Margaret Brondo (4/11/02) and Svea Schnabel (10/29/02), one written well more than a year after and the other almost two years after Plaintiff's claimed termination date, commission was paid to Financial Freedom employee John Harrison. (Affidavit of John Harrison, ¶ 3). Mrs. Brondo was seeking to refinance her then current reverse mortgage which was being serviced by Financial Freedom. Accordingly, she was receiving monthly statements that included a telephone number for Financial Freedom which customers are directed to call with any questions. (Harrison aff., ¶ 4). Mrs. Brondo called in on February 6, 2002. (Exhibit A to Harrison aff.). Mr. Harrison was referred the call from

Mrs. Brondo and secured from Mrs. Brondo an application to refinance her existing mortgage and worked with her through the processing and closing of the loan. (Harrison aff., ¶ 4).

Mrs. Schnabel's nephew with power of attorney, William Collins, who lives in Norwalk, made direct contact with Financial Freedom's CFO Al Benedetti on June 17, 2002 (16 months after Plaintiff's mailing which did not go to Norwalk and did not reference Mr. Benedetti) and was then referred to Mr. Harrison (Exhibit B to Harrison aff.) who secured the loan application by working with Mr. Collins. He also worked with him through the processing and closing of the loan. (Harrison aff., ¶ 5).

Financial Freedom also does a good amount of its own advertising, maintains a website and is included on many of the same internet and other lists that Amston Mortgage appears on (Villongco aff., ¶ 9; see also Exhibit 8 hereto).

## Argument

### I.    STANDARD FOR SUMMARY JUDGEMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that a party is entitled to summary judgment if:

> [T]he pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In federal practice, summary judgment is not disfavored procedural shortcut, but is appropriate if the resisting party "fails to make a showing sufficient to establish the existence of

an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (Dist. Col. 1986), *cert. denied*, 484 U.S. 1066, 108 S. Ct 1028 (Dist. Col. 1988).

It is the Plaintiff's burden at this stage not only to come forward with evidence to support this claim, but with sufficient evidence so that a jury could properly find in his favor. *Suburban Propane, a Div. of Nat. Distillers and Chemical Corp. v. Proctor Gas, Inc.*, 953 F.2d 780 (2d Cir. 1992). Plaintiff may not rest upon mere allegations, but must present <u>competent evidence</u>, of "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 334, 106 S. Ct. at 2553. Claims based upon the plain language of documents are particularly appropriate for resolution on a motion for summary judgment. *See Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1147-8 (2d Cir. 1992), *cert. granted*, 507 U.S. 983, 113 S. Ct. 1576 (1993), *cert. denied*, 507 U.S. 986, 113 S. Ct. 1585 (1993), *aff'd*, 510 U. S. 86, 114 S. Ct. 517 (1993).

Summary judgment should be granted in this case because Plaintiff's claims are based solely upon his own speculation and conjecture and/or are void as a matter of law based upon the documents at issue and his testimony as to the facts.

## II.    PLAINTIFF HAS NO CLAIM TO COMMISSIONS AS HE PROCURED NO REVERSE MORTGAGES FOR FINANCIAL FREEDOM

Without even considering whether Plaintiff was ever an employee of Financial Freedom or whether Financial Freedom was a "successor" to Unity Mortgage Corporation, Plaintiff's

claims to commissions are subject to summary judgment because it is clear that he was not the procuring cause of any of the loans he claims, there is no evidence whatsoever to support his conjecture that the loans resulted from his December 2000 mass mailing and, even if they did, the commissions would not have been payable to Plaintiff under either Unity's or Financial Freedom's commission plans.

In *Mytych v. May Department Stores*, 260 Conn. 152, 160-161, 793 A.2d 1068 (2002), the Connecticut Supreme Court reiterated that Connecticut law "does not purport to define the wages due; it merely requires that those wages agreed to will not be withheld for any reason," and that "the formula by which an employee's wage is calculated is determined by the agreement between the employer and the employee." The "working agreement" for purposes of commission payments includes the employer's practices as to whom and when commissions are due. *Mytych v. May Department Stores,* No. X03CV98485223S, 2001 WL 290485, *7 (Conn. Super Mar. 2, 2001) (Aurigemma, J.) 7(copy attached), *aff'd*, 260 Conn. 152, 793 A.2d 1068 (2002) (and cases cited).

The plaintiffs in *Mytych* had asked the Court to determine whether the employer's sales commission plan, under which a deduction was made from each employee's gross commissions for a portion of merchandise returns which could not be attributed to a particular salesperson, violated the proscription against an employer diverting or making deductions from wages due under sections 31-71e and 31-73(b) of the Connecticut General Statutes. The Supreme Court held that, because the commission plan "provided that wages would accrue or vest after the

agreed to calculations were made to the plaintiff's gross sales," no wages were due until after those calculations had been made. 260 Conn. at 163-4. There was no violation of the claimed statutory provisions because the deductions were made prior to the wages becoming due under the terms of the employer's commission plan. *Id.*

In this case, Unity's plan provides that commissions are paid "for any loan that has closed whereupon you have generated the lead." It does not provide for payment of commissions after termination of employment. Financial Freedom's commission plan dictates that commissions are payable for loans originated directly or indirectly by a particular employee as determined in the Company's sole discretion. Commissions are payable after the termination of employment only for such loans closed within 60 days thereof. The terms of either plan dictate that summary judgment be granted on Plaintiff's claims to commissions.

Even if Plaintiff could show that Financial Freedom was a successor to Unity, which he can't, *see, infra*, pp. 35 - 38, he was not entitled to commissions under the Unity plan because he cannot show that any of the funded loans came through his "leads", i.e., were procured because of his mass mailing; he admits that no loans closed during his employment; and the plan does not provide for payments after termination of employment. *Cf. Christensen v. Bic Corporation*, 18 Conn. App. 451, 456-459, 558 A.2d 273 (1989) (where bonus plan did not provide for payment after termination "[s]ince there was no evidence that Bic had contracted to pay a bonus to persons it no longer employed, the trial court should not have submitted the case to the jury and erred in denying defendant's motion to set aside the verdict.")

Further, even if Plaintiff could prove he had a direct employment relationship with Financial Freedom, which he can't, *see, infra,* pp. 35 - 38, he would be subject to Financial Freedom's commission plan under which none of the commissions he claims would be payable because, as set forth above, he has no evidence that any of them were originated by him directly or indirectly; Financial Freedom did not determine that any of them were originated by him directly or indirectly; and none of the loans at issue closed within sixty days of his claimed termination date, but, rather, more than three months until almost two years after. *Mytych, supra.* Accordingly, Plaintiff can prove no right to any commissions and summary judgment is warranted on his breach of commission agreement claim in Count Three as well as his wage enforcement claim in Count One.[3]

###        III.    PLAINTIFF'S EMPLOYMENT IF ANY
                   WAS AT-WILL

Regardless of whether Plaintiff relies on a theory of "direct" or "successor" employment by Financial Freedom, and even if he had any proof of either theory, which he doesn't, *see infra,* pp. 35 - 38, in Connecticut, employment is presumed to be terminable at-will without liability absent an actual contractual or statutory limitation on the right to terminate, *see, e.g., Magnan v. Anaconda Industries, Inc.* 193 Conn. 558, 569, 479 A.2d 781 (1984) or a reason for termination

---

[3]      Since there is no independent substantive claim under the Connecticut wage laws, *Mytych, supra; Shortt v. New Milford Police Dept.,* 212 Conn. 294, 562 A.2d 7 (1989), the claim in Count One is based upon the same alleged breach of an agreement to pay wages alleged in Count Three. *Id.* Since there is no breach, both claims fail. *Id.*

involving an impropriety derived from an important public policy, *Sheets v. Teddy's Frosted Foods*, 179 Conn. 471, 477, 427 A.2d 385 (1980). Plaintiff claims no statutory limitation on the right to terminate his employment nor can he claim any contractual limitation. Indeed, he acknowledged in the employment documents he claims he received at his interview that Unity and Financial Freedom employment were each at-will and subject to termination by either party at any time for any reason.

Plaintiff does claim in Count Two that his employment was terminated to avoid paying him wages due in violation of the public policy expressed in Connecticut's payment of wages statutes. The Connecticut Supreme Court has made clear, however, that where a claim under *Sheets* relies upon the public policy expressed in a statute, the *Sheets* claim necessarily fails if no violation of the statute can be made out. *Thibodeau v. Design Group One Architects*, 260 Conn. 691, 701, 802 A.2d 731 (2002) (where statute expressing public policy claimed by Plaintiff did not apply to small employers, small employer could not be held liable under *Sheets* for violation of public policy expressed in statute); *Burnham v. Karl & Gelb, P.C.,* 252 Conn. 153, 161, 745 A.2d 178 (2000) (plaintiff failed to state claim under *Sheets* because allegations of retaliatory discharge did not satisfy requirements of statute upon which *Sheets* claim was based). As set forth, *supra*, pp. 20-23, Plaintiff cannot make out any violation of the Connecticut wage payment statutes. Since his *Sheets* claim is based upon the public policy expressed in those statutes, it too must fail. *Id.*

- 24 -

Moreover, Plaintiff's claim that Financial Freedom terminated his employment to avoid paying him commissions is belied as a factual matter because there is simply no evidence that he was entitled to those commissions or that the alleged failure to pay Plaintiff was designed to avoid making any payment. For nine of the eleven loans at issue, the entire origination fee (which is much more than a commission percentage of that amount) went to an independent mortgage broker. For the other two, Financial Freedom paid the commission to an employee it had determined was responsible for procuring the loan pursuant to its commission plan.

### IV.    PLAINTIFF'S FOURTH THROUGH ELEVENTH COUNTS DUPLICATE THE FIRST THREE COUNTS AND/OR FAIL AS A MATTER OF LAW

**A.    The Fourth Count Fails Because The Breach of Implied Covenant Claim Is Duplicative Of The Breach Of Contract And *Sheets* Claims**

The implied covenant of good faith and fair dealing "is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan*, 193 Conn. at 546. In order to establish a breach of the implied covenant of good faith and fair dealing under Connecticut law, a plaintiff must show (1) the existence and breach of an enforceable employment contract, and/or (2) that the employer's actions in discharging the employee violated an important public policy. *Id.*

Count Four of the Complaint, insofar as it echoes the allegations contained in Counts One through Three, is based on Plaintiff's claim that Financial Freedom breached an obligation

to pay him commissions and wrongfully discharged him. Since, as set forth, *supra*, pp. 20 - 25, there is no basis for finding that Plaintiff was owed commissions or that Plaintiff was wrongfully discharged, summary judgment is warranted on the implied covenant of good faith and fair dealing claim as well. *Magnan*, 193 Conn. at 559; *Grich v. Textron Lycoming*, 822 F. Supp. 66, 71 (D. Conn. 1993).

**B.    The Fifth, Seventh and Eighth Counts Fail Because No Actionable Representations Were Made**

The Fifth, Seventh and Eighth Counts each similarly allege that Financial Freedom failed to live up to a claimed promise to pay commissions to Plaintiff (Fifth Count), or fraudulently (Seventh Count) or negligently (Eighth Count) represented that it would pay commissions to Plaintiff and then failed to do so. Again, as set forth below, even presuming Plaintiff could show any "direct" promises or representations to him by Financial Freedom or "successor" liability for promises or representations allegedly made to him by Unity, these claims would fail for the same reasons Counts One and Three do.

Promissory estoppel serves only to revive a breach of contract claim which otherwise fails due to a lack of consideration. *See D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987). Like a breach of contract claim, it requires that the defendant have made a commitment of some kind upon which the plaintiff acted in reasonable reliance and which was subsequently breached by the defendant. *Id.*

Negligent and fraudulent misrepresentation both require the giving of false information and justifiable reliance thereon in order to be actionable, *see D'Ulisse-Cupo*, 202 Conn. at 218 (negligent misrepresentation); *Miller v. Appleby*, 183 Conn. 51, 54-55, 438 A.2d 811 (1981) (fraud).

In *Retrofit Partners v. Lucas Industries*, 201 F.3d 155 (2d Cir. 2000), the Second Circuit, applying Connecticut law, held that "[t]o make out a claim of fraudulent or negligent misrepresentation a plaintiff must show, inter alia, that there was a false statement of fact by the defendant and justifiable reliance on the statement by the plaintiff to its detriment." *Id.* at 162, *citing, Citino v. Redevelopment Agency of City of Hartford*, 51 Conn. App. 262, 273-276, 721 A.2d 1197, 1206-07 (1998). The Second Circuit upheld summary judgment on a negligent misrepresentation claim based upon 1) a statement by one of the defendant's representatives that the defendant "was serious about exploring the possibility of acquiring the program" in which the plaintiff was seeking its investment and 2) another purported statement by an employee of the Defendant that it would acquire the program on terms already discussed and execute a consulting agreement for transitioning. *Id.* The Court held that:

> [a]s to the first statement, assuming it to be an assertion of fact sufficient to support a claim of misrepresentation, [FN2] there is no evidence that the statement was false - - that Lucas was not "serious" about the possibility of making an investment. Without falsity there could have been no actionable misrepresentation.
>
> FN2, See, e.g., *Meyers v. Cornwell Quality Tools, Inc.*, 41 Conn. App. 19, 28-29, 674 A.2d 444, 450 (App.Ct 1996) ("The requirement that a representation be made as a statement of fact focuses on whether, under

- 27 -

the circumstances surrounding the statement, the representation was intended as one of fact as distinguished from one of opinion." (internal quotation marks and citation omitted)).

As to the second statement, the plaintiffs could have not justifiably relied on it to their detriment. It was followed but two months later by the execution of the Consultant Agreement which provided that the agreement "w[ould] terminate upon any decision by Lucas not to proceed with the program and no other obligations w[ould] exist." The district court correctly found, see *Retrofit Partners*, 47 F.Supp. 2d 163 at 271, that this language made clear to the plaintiffs that the defendant did not consider itself bound to enter into an agreement with the plaintiffs, and that the plaintiffs' reliance on any prior oral statements by Lucas to the contrary would therefore not have been reasonable or justified.

*Id.* at 162-3 (fn. 3 omitted).

To the extent Plaintiff is claiming reliance upon the terms of any commission plan, his claims fail because neither contained any false information and neither was breached by Financial Freedom's failure to pay him commissions. To the extent Plaintiff claims reliance upon Ehrlich's alleged statement that she would be in charge of hiring for Financial Freedom, there was no promise or representation of fact in that statement. *See Sullivan v. Massachusetts Mut. Life* Insurance, 802 F. Supp. 716, 722 (D.Conn. 1992) (alleged statement that "plaintiff did not have to worry" about continued employment is "'mere speculative expression[s] of opinion and hope....'"). To the extent he claims any expectation of continued employment in any statements made to him (and he cannot identify any statements made to him *after* the asset purchase), his reliance cannot be considered "reasonable" or "justifiable" given the statements he claims he received at his employment interview and signed acknowledging that employment

- 28 -

with either company would be at-will and could not be changed by verbal statement. *See Cowen v. Federal Exp. Corp.*, 25 F.Supp.2d 33, 38 (D.Conn. 1998) (claimed reliance on representations as to expectation of continued employment was not reasonable when the plaintiff acknowledged employment at-will could not be varied by oral statements); *Manning v. Cigna Corp.*, 807 F.Supp. 889, 897 (D.Conn. 1991) (same); *Zych v. Boehringer Ingelheim Pharmaceuticals*, No. 313377, 1997 WL 306675 (Conn. Super 1997) (Stodolink, J.) (copy attached) (same). Accordingly, summary judgment should be granted on Counts Five, Seven and Eight.

**C.    Unjust Enrichment Is Not Present In This Case**

In the Sixth Count, Plaintiff seeks restitution for the claimed "unjust enrichment" to Financial Freedom as a result of his mass mailing. As explained in *United Coastal Industries, Inc. v. Clearhart Constr. Co.*, 71 Conn. App. 506, 511-12, 802 A.2d 901 (2002):

> Quantum meruit and unjust enrichment are common-law doctrines that provide restitution, or the payment of money, when justice so requires. See *Gagne v. Vaccaro*, 255 Conn. 390, 401, 766 A.2d 416 (2001; *Sidney v. DeVries*, 215 Conn. 350, 351-52 n.1, 575 A.2d 228 (1990); *Buns v. Koellmer, supra,* 11 Conn. App. 384-85.

> Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to a contract. See 5 S. Williston, supra, § 1479. . . "In the absence of a benefit to the defendant, there can be no liability in restitution; nor can the measure of liability in restitution exceed the measure of the defendant's enrichment." Restatement (Third), Contracts, Restitution and Unjust Enrichment, § 2 (d) (Discussion Draft March 31, 2000)....

There is no basis for granting restitution in this case. Plaintiff was not entitled to commissions under Unity's or Financial Freedom's commission plans. There is no evidence

linking Plaintiff's mass mailing to any loans subsequently funded by Financial Freedom; the evidence shows that the loans claimed by Plaintiff were secured through the efforts of others who were fully compensated for their efforts. Thus, Plaintiff cannot show any "benefit" to Financial Freedom and there is no basis for restitution. *Id.* Summary judgment should be granted on the Sixth Count. *Id.*

**D.    The Ninth Count Alleging Negligent Infliction Of Emotional Distress Fails Because No Unreasonable Behavior Is Alleged By Plaintiff In The Termination Of His Employment**

In *Perodeau v. Hartford*, 259 Conn. 729, 758-764, 792 A.2d 752 (2002), the Connecticut Supreme Court held that a cause of action for negligent infliction of emotional distress in the employment context may only be brought based on actions taken in connection with the termination of the employment relationship. Plaintiff described the termination of his employment as a telephone call from Jeanine Ehrlich in which she told him that his employment was to be terminated as a result of Financial Freedom's policies.

However, even if Plaintiff could show that he was employed by Financial Freedom which he cannot, *see infra,* pp. 35-38, "[t]he mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior. . . ." *Parsons v. United Technologies Corp.* 243 Conn. 66, 88-89, 700 A.2d 655 (1997). Claims for infliction of emotional distress in the employment context arise only when based upon outrageous or "unreasonable conduct of the defendant in the termination process. . . ." *Id.* To state a claim for

negligent infliction of emotional distress, a plaintiff must plead and prove that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Parsons*, 243 Conn. at 88, *quoting*, *Montinieri v. Southern New England Tel. Co.*, 175 Conn. 337, 345, 398 A.2d 1180 (1978). Connecticut Courts which have properly considered the second element of the claim, i.e., the defendant's recognition that the emotional distress if caused might result in illness or bodily harm, have found that the conduct alleged must be particularly egregious as well as unreasonable to withstand a motion to strike. *See Roberts v. Andersen Laboratories*, No. CV950370759 S, 1997 WL 663303 (Conn. Super. Oct. 14, 1997) (Barnett, J.) (copy attached); *Rodziewicz v. The Stanley Works*, No. CV920509387S, 1997 WL80667 (Conn. Super. Feb. 4, 1997) (Lavine, J.) (copy attached); *Chieffalo v. Norden Systems, Inc.,* No. CV920127694S, 1996 WL 532373 (Conn. Super. Sept. 12, 1996) (Ryan, J.) (copy attached), *aff'd*, 49 Conn. App. 474 (1998).

Claims for negligent infliction of emotional distress have been dismissed, for example, in *Parsons*, 243 Conn. at 88-9 where 1) the plaintiff alleged he was abruptly terminated for reasons violating public policy and then escorted out of the building in an embarrassing manner and 2) the plaintiff alleged he was falsely accused of stealing without proper investigation and terminated from employment, *Morris v. Hartford Courant Co.*, 200 Conn. 676, 684, 513 A.2d 66 (1986), 3) the plaintiff alleged she was wrongly accused of striking a patient and then discharged, *Edwards v. Northbridge Health Care Ctr.*, No. CV970346457S, 1998 WL 550776 (Conn. Super. 1998)

- 31 -

(Melville, J.) (copy attached), and 4) the plaintiff alleged her employer wrongly accused her of filing a fraudulent workers compensation claim and then terminated her without a proper investigation, *Menard v. People's Bank*, No., 1998 WL 177536 (Conn. Super. 1998) (copy attached). Plaintiff's description of Ehrlich's behavior in terminating his employment does not even approach what has been considered insufficient for a claim of negligent infliction of emotional distress under Connecticut law. Summary judgment should be granted.

**F.    CUTPA Is Not Implicated In This Case**

It has long been held by the Connecticut Courts, both state and federal, that CUTPA does not apply to employment relationships. *See, e.g., Kinter v. Nidec-Torin Corp.*, 662 F. Supp. 112, 113 (D. Conn. 1987); *Banerjee v. Roberts*, 641 F. Supp. 1093 (D. Conn. 1986); *United Components v. Dowiak*, 239 Conn. 259, 264-5, 684 A.2d 693 (1996); *Quimby v. Kimberly Clark Corporation*, 28 Conn. App. 660, 670, 613 A.2d 838 (1992).

As explained by the Court in *Quimby:*

> The plaintiff does not allege that the defendant committed these acts "in the conduct of any trade or commerce." The terms trade and commerce are defined in General Statutes § 42-110a (4) as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value in this state." The relationship in this case is not between a consumer and a commercial vendor, but rather between an employer and an employee. There is no allegation in the complaint that the defendant advertised, sold, leased or distributed any services or property to the plaintiff. The United States District Court in *Banerjee v. Robert*, 641 F. Supp. 1093 (D. Conn. 1986), held that the employer-employee relationship does not fall within the

definition of trade or commerce for the purposes of an action under CUTPA. The *Banerjee* court noted that "[a]lthough an employer may engage employees for the purpose of promotion trade or commerce, the actual employment relationship is not itself trade or commerce for the purpose of CUTPA." *Id.* 1108, citing *Manning v. Zuckerman*, 388 Mass. 8, 13, 444 N.E.2d 1262 (1983) (construing similar Massachusetts statute); see also *Collins v. Gulf Oil Corporation*, 605 F. Supp. 1519, 1523 (D. Conn. 1985). [Footnote omitted].

Plaintiff frames his CUTPA claim as one based "in the alternative" on allegations that if it is found that Financial Freedom did not have an employment relationship with him, Financial Freedom is liable under CUTPA for utilizing "the device of the acquisition of reverse mortgage loan assets of Unity Mortgage Corp. to cause a severance of the agreement with plaintiff and then used the fruits of Plaintiff's labors so as to keep all the profit for its own enrichment." (Complaint, ¶ 58). However, the allegation of an act designed to sever an employment relationship, like an employment relationship, is not an act in "trade or commerce" for the purposes of CUTPA. See *id.*

Moreover, CUTPA also requires that the act alleged as the basis for the violation constitute an "unfair or deceptive" practice. As set forth in *Mead v. Burns*, 199 Conn. 651, 664-65, 509 A.2d 11 (1986):

The Connecticut Supreme Court has adopted the standard of *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972), to assist in such determinations. See *Conaway v. Prestia*, 191 Conn. 484, 492-93, 464 A.2d 847 (1983). "Under that standard [we will look] to a number of factors in deciding whether an action or practice is unfair:' "() whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or

- 33 -

other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. . . ." " *FTC v. Sperry & Hutchinson Co., supra,* 244 n. 5."

No such acts are alleged or can be proven in this case.  There is simply nothing unfair or deceptive about a company choosing who it will or will not hire in purchasing part of the assets of another company.  Plaintiff had no vested right to continued employment because his status, if any, was at-will.  As set forth above, Plaintiff cannot show that he was deprived of any monies due him and the evidence is that it was properly paid to those who procured the loans at issue.  The evidence shows nothing unfair or deceptive about any action taken by Financial Freedom.  The CUTPA claim fails legally and factually and summary judgment is warranted on Count Ten.  *Mead, supra.*

**G.    The Tortious Conspiracy Claim In Count Eleven Similarly Has No Basis In Law or Fact**

Plaintiff's Eleventh Count alleges that, in combination with Unity Mortgage, Financial Freedom conspired to and did deprive "plaintiff of his lawful compensation...." (Complaint, ¶¶ 65-66).  Under Connecticut law, the elements of civil conspiracy are (1) a combination between two or more persons, (2) to do a criminal or unlawful act or to utilize criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme in furtherance of the object, and (4) which results in damage to the plaintiff.  *Marshak v. Marshak,* 226 Conn. 652, 628 A.2d 964 (1993), *overruled on other grounds, State v. Vakilzaden,* 251 Conn. 656, 742 A.2d 767 (1999).  "A claim of civil conspiracy . . . is insufficient unless based on some

underlying cause of action." *Litchfield Asset Management Corp. v. Howell*, 70 Conn. App. 133, 140, 799 A.2d 298, *cert. denied*, 261 Conn. 911, 806 A.2d 49 (2002) (internal quotation marks omitted.)   Here the underlying cause of action, failure to pay wages, fails and so must the "conspiracy" claim. *Id.*  There is no evidence of any of the elements of a civil conspiracy in this case.  Simply, there was nothing criminal or unlawful in any of Financial Freedom's alleged actions.  Summary judgment should be granted on the Eleventh Count.

## V.    THERE WAS NEVER AN EMPLOYMENT RELATIONSHIP BETWEEN FINANCIAL FREEDOM AND UNITY

To the extent Plaintiffs claims seek recovery based upon an alleged employment relationship between himself and Financial Freedom, they are all subject to summary judgment for the additional reason that no such relationship ever existed.

### A.    There Was No Direct Employment Relationship Between Financial Freedom and Plaintiff

In *Geary v. Wentworth Laboratories,* 60 Conn. App. 622, 627, 760 A.2d 969, 973 (2000), the Connecticut Appellate Court, applying rules of contract formation, spelled out the elements necessary for establishing an employment relationship:

> The rules governing contract formation are well settled.  "To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties....   To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties....  If the minds of the parties have not truly met, no enforceable contract exists....  [A]n agreement must be definite and certain as to its terms and

> requirements.... So long as any essential matters are left open for
> further consideration, the contract is not complete."
>
> * * *
>
> Certain material terms such as the duration, salary, fringe benefits
> and other conditions of employment are deemed essential to an
> employment contract. See *D'Ulisse-Cupo v. Board of Directors of
> Notre Dame High School, supra*, 202 Conn. at 215, 520 A.2d 217.

Plaintiff has no evidence that Financial Freedom ever offered him employment nevertheless that there was any agreement as to any of the conditions of such employment. The employment application relied upon by Plaintiff clearly states that it does not constitute an offer of employment. Neither does it spell out any terms other than at-will status. To the extent Plaintiff claims to rely upon statements made by Jeanine Ehrlich, he cannot even identify any made by her after she became employed by Financial Freedom, see, *supra*, p. 8. To the extent he relies upon her alleged statement in his October 2000 interview (when she was employed by Unity) that she would be in charge of hiring for Financial Freedom and that it would not be a problem, there is no basis for binding Financial Freedom to that statement which, in any event, was not promissory or representational in nature, *see, supra* p. 26 - 29. At best, it represented Ms. Ehrlich's hope, that when she became an employee of Financial Freedom, that Plaintiff would be offered employment by Financial Freedom as well. However, since "mere representations indicating an intent to enter into another employment contract at some time in the future do not support contractual liability," *Geary*, 60 Conn. App. at 626, 760 A.2d at 972, *citing, D'Ulisse-Cupo, supra*, expressions of hope that an employment relationship will be

- 36 -

entered into made by persons who hope to become affiliated with an employer in the future cannot either. *Cf. id* .

## B.    Financial Freedom Was Not A Successor To Unity

Even assuming that Plaintiff and Unity had an employment relationship and that any liability to Unity has arisen from that relationship[4], as stated by this Court in *Ricciardello v. J.W. Gant & Co.,* 717 F. Supp. 56, 59 (D.Conn. 1989), *citing, Davis v. Hemming,* 101 Conn. 713, 725, 127 A. 514 (1925):

> A sale of assets by one corporation to another, in good faith and for valuable consideration, does not impose any liability on the buyer for the debts of the seller.

Although there are several exceptions to this general rule - - where (1) the purchase agreement so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability, *id.* at 58 - - as in *Ricciardello*, there is no evidence of any exception in this case. "The first exception is inapplicable because the agreement expressly excluded [Financial Freedom's] liabilities for debts or liabilities of [Unity]. 717 F. Supp at 58." Moreover, because [Financial Freedom] operated its own [reverse mortgage] business prior to

---

[4]    Since Plaintiff voluntarily dismissed Unity as a party to this suit, it is difficult to conceive how the Court may determine whether Unity has any liability for which Financial Freedom would be liable even if Financial Freedom were determined to be a "successor" employer. Absent an appropriate determination as to Unity's liability, there is no basis upon which to assess successor liability.

the transfer of assets, it was not formed for the purpose or reorganizing [Unity] and shares no common officers, directors, stock or stockholders with [Unity]. [Financial Freedom] is not a 'mere continuation' of [Unity's] corporate identity." *Id.* and cases cited. "There merger exception does not apply to this case because plaintiff [can] not establish[ ] either a continuity of stockholders or an inadequacy of consideration." *Id.* Neither can Plaintiff establish that the transaction was fraudulent. "If Plaintiff purports to rely on fraud to impose successor liability upon [Financial Freedom], he must plead with particularity facts from which fraud may be inferred." *Id.* Plaintiff has not done so. To the extent he alleges that the transaction was entered into to cause a severance of his employment relationship with Unity and/or so that Financial Freedom could benefit from his mass mailing without having to pay him commissions, those allegations are spurious and do not establish the fraud necessary to impose successor liability. On its face, an allegation that one corporation purchased the assets of another to save the first from having to retain a part-time at-will commissioned salesperson who had produced no business, is patently ridiculous. Moreover, there is no evidence that Financial Freedom even knew of Plaintiff's employment by Unity. Further, there is no evidence that when the asset purchase was concluded in November 2000, Financial Freedom knew that Plaintiff would be sending a mass mailing to residents of Stamford and Greenwich in December or that it purchased Unity's assets "to reap the benefits" of that mailing. There is no basis for a finding of "successor" liability in this case, *Ricciardello, supra,* and summary judgment is warranted on all counts.

Done at Bridgeport, Connecticut, this _10_<sup>th</sup> day of February, 2004.


_Loraine M. Cortese-Costa_
Loraine M. Cortese-Costa
DURANT, NICHOLS, HOUSTON,
HODGSON & CORTESE-COSTA, P.C.
1057 Broad Street
Bridgeport, CT 06604
203-366-3438
Federal Bar No. ct03984

ATTORNEYS FOR FINANCIAL FREEDOM