UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM J. MAZE, | : |
| | : CIVIL ACTION NO. |
| Plaintiff, | : 3:03CV166 (SRU) |
| | : |
| v. | : |
| | : |
| FINANCIAL FREEDOM SENIOR | : |
| FUNDING CORPORATION | : |
| | : |
| Defendants. | : FEBRUARY /0 , 2004 |

**DEFENDANT'S STATEMENT
PURSUANT TO LOCAL RULE 56(a)(1)**

Defendant, Financial Freedom Senior Funding Corporation ("Financial Freedom"), by and through its undersigned counsel, submits this statement pursuant to Local Rule 56(a)(1) setting forth the material issues of fact upon which Financial Freedom contends there is no genuine issue to be tried dictating that its motion for summary judgment be granted.

1.  By letter dated October 12, 2000 (attached as Exhibit 2 to Defendant's memorandum of law in support of Motion for Summary Judgment[1]), Plaintiff was apparently extended an offer of employment by Unity Mortgage Corporation to act as a Reverse Mortgage Specialist paid on a commission basis as follows:

> 35% of the origination fee for each closed loan when Unity
> Mortgage Corporation in Albany, NY supplied you with the

---

[1] Hereinafter "Def. mem."

> lead. The Commission structure will be 50% of the origination fee for any loan that has closed whereupon you have generated the lead.

The letter does not offer any expense reimbursement; neither does it provide for any payment of commissions after termination of employment. (*Id.*)

2. Plaintiff claims he had found information about Unity Mortgage Corporation on the Internet, called for information and was referred to a Regional Manager, Jeanine Ehrlich (Deposition Transcript of William Maze[2], pp. 30-33).

3. Plaintiff met with Ms. Ehrlich in October of 2000, at which time, he claims Ms. Ehrlich gave him employment application forms for Unity Mortgage Corporation and Financial Freedom (Pl. dep., pp. 56-58) and told him to send them to her when she told him to (Pl. dep. pp. 66-67).

4. Plaintiff claims Ms. Ehrlich discussed with him the fact that Unity was in the process of being bought by Financial Freedom and that she would still be running the office and responsible for hiring when it did. (Pl. dep., p. 47).

5. Plaintiff returned the completed Financial Freedom employment application (attached as Exhibit 4 to Def. mem.) to Ms. Ehrlich on November 24, 2000 (Pl. dep., pp. 64-65) stating in his cover letter: "Please find enclosed my completed Employment Application which I have been holding as you suggested until the takeover had been finalized – which, I understand, is now the case."

6.      The Financial Freedom employment application includes an acknowledgement providing that it does not constitute an offer of employment and that employment, if any, with Financial Freedom is at-will.

7.      On December 1 and 2, 2000, Plaintiff signed employment forms for Unity Mortgage Corporation (attached as Exhibit 5 to Def. mem.).

There is a "Receipt of Employee Handbook" form signed by Plaintiff stating that:

> I have entered into my employment relationship with Unity Mortgage voluntarily and acknowledge that there is no specified length of employment. Accordingly, either I or Unity Mortgage can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law.
>
> Since the information, policies, and benefits described here are necessarily subject to change, I acknowledge that revisions to the handbook may occur, except to Unity Mortgage's policy of employment-at-will. All such changes will be communicated through official notices, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the chief executive officer of Unity Mortgage Corp. has the ability to adopt any revisions to the polices in this handbook.

There is a signed Unity Mortgage "Applicant Statement" form signed by Plaintiff providing that:

> If I am hired, I understand that I am free to resign at any time, with or without cause and without prior notice, and the employer reserves the same right to terminate my

---

[2]     Hereinafter "Pl. dep.", cited pages are attached as Exhibit 3.

> employment at any time, with or without cause and without prior notice, except as may be required by law. This application does not constitute an agreement or contract for employment for any specified period or definite duration. I understand that no supervisor or representative of the employer is authorized to make any assurances to the contrary and that no implied oral or written agreements contrary to the foregoing express language are valid unless they are in writing and signed by the employer's president.

There is a certification to the application form signed by Plaintiff stating that:

> I understand I may terminate my employment at any time and for any reason without prior notice. I agree that if I am hired, I will be employed at the will of Unity Mortgage Corp. and my employment can be terminated at any time, with or without notice. *** I understand the company reserves the right to add to, change and/or delete their policies, procedures, work rules and benefits at any time and that no one in the Company has the authority to enter into any agreement, for any particular period of time, or contrary to the above terms, unless that agreement is set forth in writing and signed by the President or Senior Vice President of Unity Mortgage Corp.

Finally, there is a "Conditions of Employment" form from the Unity Mortgage Corp. Policy and Procedures Manual signed by Plaintiff stating that:

> I am aware that my employment is "At Will" meaning I can quit at any time and likewise, may be terminated at any time. In this regard, I understand that the current policies and procedures may be changed from time to time and that no current policies and procedures constitute a contract between myself and Unity Mortgage Corp.

8. When asked why he had completed and signed these forms eight days after returning the Financial Freedom application to Ms. Ehrlich, Plaintiff testified:

> The reason is my understanding was Financial Freedom were buying over the Unity Mortgage company. Anything that was filled in on the forms for Unity Mortgage was on the instructions of Jeanine Ehrlich as a stop gap measure. Because I believe she told me that Financial Freedom was not yet fully licensed to do business in Connecticut and that they had to obtain these licenses which was going to take some time. And in the meantime to fill in these forms for Unity Mortgage as a formality. . . . (Pl. dep., p. 70).

9.  Plaintiff claims Ms. Ehrlich made representations to him that led him to believe he was or would be employed by Financial Freedom but, aside from her alleged statements in the October 2000 interview that she would be running the office and responsible for hiring after the asset purchase, Plaintiff could not substantiate that any representations were made by Ms. Ehrlich to him. (Pl. dep., pp. 76-77)

10.  When asked if he had ever received an offer of employment with the name Financial Freedom on it, Plaintiff identified the Financial Freedom employment application he had filled out which, as noted above, specifically provides that it does not create an offer of employment. (Exhibit 4 to Def. mem).

11.  Financial Freedom purchased the reverse mortgage assets of Unity Mortgage on November 23, 2000 (affidavit of Junie Villongco, Financial Freedom's Vice-President of Administration, ¶ 3) and Unity Mortgage Corporation continues to exist as an independent corporation with corporate offices located at Unity Mortgage Corp., 7840 Roswell Road, Atlanta, GA 30350. (*Id.*). Financial Freedom's headquarters are located at 7595 Irvine Center Drive, Suite 250, Irvine, California 92618. (*Id.*).

12. The two companies are not commonly owned, controlled or managed. (*Id.*).

13. In connection with the purchase of Unity's reverse mortgage assets, Financial Freedom agreed to hire certain specified Unity employees set forth on a list of Unity employees prepared by Unity. Plaintiff did not appear on that list. (Villongco aff., ¶ 4 and Exhibit A thereto).

14. Those Unity employees hired by Financial Freedom were sent letters offering them employment with Financial Freedom and setting forth the terms and conditions thereof. (Villongco aff., ¶ 5 and Exhibit B thereto).

15. Loan Originators hired by Financial Freedom from Unity were sent letters offering them employment with Financial Freedom in an at-will status. (Exhibit B to Villongco aff.).

16. Plaintiff was not sent this letter. (Villongco aff., ¶ 5; Pl. dep., p. 70).

17. Unity retained all and Financial Freedom assumed no obligations with respect to Unity employees, like Plaintiff, who were not offered employment with Financial Freedom (Villongco aff., ¶ 6 and Exhibit A thereto).

18. The Commission Compensation Schedule for Unity employees hired by Financial Freedom provides that commissions are payable for "Direct Origination Loans" and "Indirect Origination Loans" defined as follows:

> "Direct Origination Loans" shall mean those funded Loans that the Firm has determined were originated solely through your own efforts. The identification of loans as Direct

      Origination Loans or Indirect Origination Loans shall be made by Firm management in its sole discretion.

      "Indirect Origination Loans" shall mean those funded Loans that the Firm has determined you had substantial origination responsibilities, but not solely through your own efforts. The identification of loans as Direct Origination Loans or Indirect Origination Loans shall be made by Firm management in its sole discretion. (Exhibit B to Villongco aff., Schedule A).

    19.    With respect to payment of commissions following termination of employment, the Commission Compensation schedule provides:

> **e) Commission Payments on Termination of Employment.**
> Commission will be paid following any termination of employment with respect to Eligible Loans that were funded, and (if applicable) Annuities that are sold, before such termination of employment. In addition, commissions will also be paid following employment termination with respect to Eligible Loans that have reached at least the underwriting stage at the time of employment termination and that are funded within 60 days after employment termination. No commission payments will be made with respect to Annuities sold after employment termination. (Exhibit B to Villongco aff., Schedule A).

    20.    From November 23, 2000 through the end of January 2001, Unity Mortgage continued its reverse mortgage business in Connecticut because Financial Freedom had not yet obtained its licensure in Connecticut. (Villongco aff., ¶ 7).

    21.    By agreement, those employees of Unity who had been hired by Financial Freedom, including Jeanine Ehrlich, continued to act on behalf of Unity during this time period. (*Id.* and Exhibit A thereto)

22. During the transition, use of Financial Freedom computer programs and reporting systems which Unity employees and contractors may have had access to, were phased in and used by Unity. (*Id.* and Exhibit A thereto).

23. In December of 2000, Plaintiff claims he sent out a mailing advertising the availability of reverse mortgage loans through Unity Mortgage (copy attached as Exhibit 6 to Def. mem.) to senior residents of Stamford and Greenwich whose names and addresses he had obtained by Freedom of Information requests to those two towns. (Pl. dep., p. 78-82).

24. The lists contain approximately 1300 names and addresses. (Affidavit of Clara Koczi Paralegal, ¶ 4).

25. Plaintiff's business card also identified Unity Mortgage as his employer (attached as Exhibit 7 to Def. mem.).

26. In the years 2001 and 2002, Financial Freedom funded approximately 495 reverse mortgage loans in the State of Connecticut (Villongco aff., ¶ 8).

27. By checking land records in the Towns of Stamford and Greenwich, Plaintiff uncovered the names of nine individuals who had appeared on his lists and who had obtained reverse mortgage loans funded by Financial Freedom. (Pl. dep., pp. 161-162).

28. In discovery, Plaintiff was provided a listing of all 495 loans from 2001 and 2002 and found two additional individuals he claims to have sent his mailing to in December 2000 (see Plaintiff's Supplemental Initial Disclosure, Exhibit 1 to Def. mem).

29. Plaintiff claims he is entitled to commissions on these loans simply by virtue of the fact that he asserts the individuals were sent his mass mailing in December 2000 (Pl. dep., p. 160).

30. Plaintiff's testimony acknowledges that the basis for his claims is purely conjecture (Pl. dep., p. 161).

31. Plaintiff also acknowledged that there were other ways of finding reverse mortgage lenders in Connecticut aside from his mass mailing (Pl. dep., p. 56).

32. Plaintiff claims his employment was terminated by Jeanine Ehrlich towards the end of January 2001 and that she used "Financial Freedom's policies" as the reason for it. (Pl. dep., pp. 121-122).

33. The eleven loans Plaintiff claims commissions on are as follows:

- Loretta Pipicelli dated 10/9/01
- Rafella Vizzari dated 11/7/01
- Adelaide Stowell dated 11/8/01
- Genevieve Walsh dated 10/25/02
- Svea Shnabel dated 10/29/02
- Claire Hirt dated 5/1/01
- Felicity Hoffecker dated 8/20/01
- Margaret Brondo dated 4/11/02
- Sophie Parker dated 6/7/02
- Lillian Hultgreen dated 12/14/01
- Dagny Halka dated 6/27/02

(Plaintiff's Supplemental Initial Disclosures, attached as Exhibit 1 to Def. mem., pp. 2-3).

34. The earliest of the claimed loans (Hirt) is dated more than three months after Plaintiff's claimed termination date; some (Walsh and Schnabel) extend as far out as twenty-one months after.

35. Despite the allegation contained in paragraphs 21 and 22 of the Complaint, Plaintiff admits he did not secure applications from any of these individuals or any other potential customers (Pl. dep., pp. 43-44), which Plaintiff acknowledges is the event that commences the processing of any loan (Pl. dep., p. 38).

36. Plaintiff also claims to have met with several other individuals who called within a month after his mailing was sent out but none of those individuals ever secured financing funded through Financial Freedom (Pl. dep., pp. 103-106; 110-113).

37. Like any mortgage, reverse mortgage loans include origination fees which are a percentage of the loan amount (Villongco aff., ¶ 8).

38. Financial Freedom funded loans are mainly secured by customers through independent licensed brokers who retain the origination fee for each closed loan they have originated and processed. (Villongco aff., ¶ 8).

39. Financial Freedom loans can also be obtained directly through the Company's Loan Originators in which case Financial Freedom retains the entire origination fee and may pay a commission, which is a percentage of the origination fee amount, to employees it determines were responsible for originating and processing the loan. (Villongco aff., ¶ 8).

40. Financial Freedom retains the discretion to decide what employees are entitled to commissions on what loans (Villongco aff., ¶ 8 and Exhibit B thereto, Schedule A).

41. For nine of the eleven loans cited by Plaintiff - - Pipicelli; Vizzari; Stowell; Walsh; Hirt; Hoffecker, Parker, Hultgreen and Halka -- the entire origination fees were paid to an independent, licensed mortgage broker in Connecticut, Amston Mortgage Co. (Affidavit of Amston Mortgage President, Todd Walters[3], ¶ 2).

42. In each case, Mr. Walters secured a loan application for a reverse mortgage on the subject property. After an initial inquiry was made directly to Amston, Mr. Walters sent each property owner and/or advisor a packet of materials and then met one or more times with the property owner and/or the property owner's advisors (the age of those eligible for reverse mortgage loans often requires dealing through a person with power of attorney or other representative authority), counseling them as to the various options and issues related to reverse mortgages and working through any problems arising in the processing and closing of the loans. (Walters aff., ¶ 4).

43. Adelaide Stowell and Genevieve Walsh were referred to Mr. Walters by their attorneys. (Walters aff., ¶ 4). Mrs. Walsh had initially been referred and secured a loan through Amston in 1999; she came back to Amston for new financing in 2002. (Walters aff., ¶ 4).

---

[3] Hereinafter cited as "Walters Aff."

44. Sophie Parker was also a repeat customer of Amston, first securing financing through them in 1997 and then refinancing in 2002; the same is true of Mrs. Hultgreen. (Walters aff., ¶ 4).

45. Mr. Walters had numerous meetings with Felicity Hoffecker and was aware that she was meeting with several other lenders as well. (Walters aff., ¶ 4).

46. Mr. Walters looked into an issue involving Mrs. Hoffecker's house being on a private road and knew that she had initially decided to obtain funding through Amerifirst, another mortgage company, until he was able to offer her an FNMA product for which the private road was not a problem. (Walters aff., ¶ 4).

47. All the other referenced property owners were similarly referred to Amston and Mr. Walters through other sources that Amston has developed over the eight years it has been in business in Connecticut. (Walters aff., ¶ 5).

48. These sources include but are not limited to Amston's own website (in existence since 1996) and numerous listings of licensed reverse mortgage lenders appearing on the Internet (see, e.g., National Reverse Mortgage Lenders Association listing, attached as Exhibit 8 to Def. mem.) and supplied to seniors by various State and Town housing and elderly service offices throughout Connecticut. (*Id.*)

49. None of the referenced clients was referred to Amston by anyone at Unity Mortgage or Financial Freedom (direct sales employees of which are Amston's competitors) and

no payment was made by Amston to Unity Mortgage, Financial Freedom or any employee of either company in connection with those loans. (*Id.*).

50. None of the information contained in the mailing sent by Mr. Maze referred to Amston Mortgage or any means of contacting Amston or Mr. Walters. (See Exhibit 5 to Def. mem.).

51. For the other two loans claimed by Plaintiff, Margaret Brondo (4/11/02) and Svea Schnabel (10/29/02), one written well more than a year after and the other almost two years after Plaintiff's claimed termination date, commission was paid to Financial Freedom employee John Harrison. (Affidavit of John Harrison, ¶ 3).

52. Mrs. Brondo was seeking to refinance her then current reverse mortgage which was being serviced by Financial Freedom. Accordingly, she was receiving monthly statements that included a telephone number for Financial Freedom which customers are directed to call with any questions. (Harrison aff., ¶ 4).

53. Mrs. Brondo called in on February 6, 2002. (Exhibit A to Harrison aff.). Mr. Harrison was referred the call from Mrs. Brondo and secured from Mrs. Brondo an application to refinance her existing mortgage and worked with her through the processing and closing of the loan. (Harrison aff., ¶ 4).

54. Mrs. Schnabel's nephew with power of attorney, William Collins, who lives in Norwalk, made direct contact with Financial Freedom's CFO Al Benedetti on June 17, 2002 (16 months after Plaintiff's mailing which did not go to Norwalk and did not reference Mr.

Benedetti) and was then referred to Mr. Harrison (Exhibit B to Harrison aff.) who secured the loan application by working with Mr. Collins. He also worked with him through the processing and closing of the loan. (Harrison aff., ¶ 5).

55. Financial Freedom also does a good amount of its own advertising, maintains a website and is included on many of the same internet and other lists that Amston Mortgage appears on. (Villongco aff., ¶ 9; see also Exhibit 8 hereto).

Done at Bridgeport, Connecticut, this 10th day of February, 2004.

_/s/ Loraine M. Cortese-Costa_
Loraine M. Cortese-Costa
DURANT, NICHOLS, HOUSTON,
HODGSON & CORTESE-COSTA, P.C.
1057 Broad Street
Bridgeport, CT 06604
203-366-3438
Federal Bar No. ct03984

ATTORNEYS FOR FINANCIAL FREEDOM

## **CERTIFICATION**

This is to certify that a copy of the foregoing was cause to be mailed, via U.S. Mail, postage prepaid, this 10th day of February, 2004, to all counsel and pro se parties of record:

Valerie E. Maze, Esq.
1465 E. Putnam Avenue #111
Old Greenwich, CT 06870

                                                Loraine M. Cortese-Costa

P:\lit\LCC\311750\002\00038310.DOC